[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION 
The instant proceeding is a contested dissolution of a certain marriage between the parties which occurred on August 29, 1991 at New Milford, Connecticut. The Plaintiff has resided continuously within this jurisdiction for at least one year next preceding the date of the filing of the complaint. No minor children have been born as a result of this union and no minor children have been born to the plaintiff since the date of the marriage. No federal, state, or local agency is contributing to the support of either party. The court finds that the marriage has broken down irretrievably and a decree may enter on the grounds of irretrievable breakdown.
The plaintiff is fifty-eight years old and is a German national who immigrated to the United States in 1961 at the age of eighteen. She came here to visit friends. While living here, and as a result of the living CT Page 169 of arrangements at that particular location, she was married. That relationship was nothing more than an adventure and it terminated in an annulment.[1] She claims to have received her formal education in Germany in what is suggested to be "Herbal Pharmacology." However, she also recited that her "entitlement" which flows from that degree is limited to herbal compounding. It is equivalent to an American college degree in her description of it. She also claims to hold an alien card which permits her to be in this country permanently. While that testimony appears to be rather questionable, it was neither challenged or rebutted.
This is her second marriage, her first endured for twenty-two (22) years and ended with a divorce in 1989. One child, a boy, was born of that union. During those years, she was primarily a homemaker. She expresses quite an interest in horses and indicates that during that first marriage she did waitress to some extent to pay the expenses of that hobby. Her first full-time employment was in an veterinary hospital in Georgetown, Connecticut, in the mid-1980s where she worked as a receptionist. She claims to have trained as a surgical technician for three years. Thereafter, she became the manager of "Slender-U" and served as a counselor in the diet center that appears to be an adjunct of the primary business, in 1989, she became a project coordinator for CSI, which is ostensibly a research center where she distributed research to other centers as the project coordinator. At that time, she was awarded and enjoyed full benefits from her employment. She professes an earning capacity ranging from twenty-one thousand ($21,000) dollars to twenty-three thousand ($23,000) dollars in those endeavors and left that employment when she married the defendant. Her current employment is in a medical office in the Sandy Hook section in the Town of Newtown. She works at the front desk which is described as a highly stressful occupation.
As well as being an employee of that medical group, she also became a patient. Beginning in November of 1999, she began to experience heart problems. At that time, she complained of chest pains and was diagnosed as hypertensive with blood pressure readings which hardly sound abnormal. There was a question at that time as to whether or not she was in immediate risk of a heart attack and was sent to Danbury Hospital where she remained overnight. Her blood pressure readings were 140 over 90 with a declared normal rate of 120 over 80. Either of which is a reading that would be gratefully accepted by the majority of the adult citizenry. It is unclear whether her reading is with medication or without. She also suffers from a condition not completely related to hypertension which manifests itself as a mild stiffening of the left ventricle (cardiac wall) and a thickening of that wall. As a result of these problems, her physician has directed her to reduce her work schedule to twenty-four (24) or twenty-five (25) hours per week with the accompanying diminution in CT Page 170 her income.
The defendant, who will be fifty-five in December of this year, is conceded to be in excellent health with the sole exception of an encounter with "situational depression" for which he was treated with Zoloft. It appears as though that problem has not recurred. He is a veteran of three and one-half years in the armed forces, specifically the Air Force. He was honorably discharged, or released from active duty in April of 1966. He joined the Perkin-Elmer Company in 1973 where he is employed today in computer operations. He is currently a software engineer residing in Freemont, California. When he was transferred to the Silicon Valley in California, his annual salary of seventy-two thousand ($72,000) dollars increased to ninety-two thousand ($92,000) dollars, which the court considers as a fair measure of his earning capacity. He is currently paying one thousand four hundred thirty ($1430) dollars a month in rent and his son lives with him contributing four hundred ($400) dollars a month towards that rent, the total of which is one thousand eight hundred thirty ($1830) dollars per month. Among his benefits is an employee's savings plan, stock options with PE Corporation (formerly known as Perkin-Elmer Corporation) and a life insurance policy which approximates his annual salary. In addition to his salary, he also receives a bonus each year, the amount of which last year or this year was eleven thousand ($11,000) dollars.
The parties met at a restaurant in Ridgefield where they would stop for drinks after work. This became a steady habit. They began to date, took trips together, and decided to live together at his address. At the time, she owned a home in Danbury. As a result of the dissolution of her first marriage, she subsequently sold that home and realized approximately one hundred thousand ($100,000) dollars from that sale. In addition to the funds from the sale of the house, she had an alimony settlement of twenty-five thousand ($25,000) dollars, and an additional thirteen thousand ($13,000) dollars which was held by the court, according to the testimony, which was ultimately released to her. She was debt free. The defendant came to the marriage with the clothes on his back and a guitar. He was debt free because of his father's largesse in paying his debts. While living in his home, she contributed to the lifestyle they enjoyed. She claims to have payed rent, paid his counsel fees for his divorce, and his child support payments when necessary. In other words, she did whatever was necessary economically.
The plaintiff developed a very close relationship with the defendant's father who became afflicted with cancer. She visited him in the hospital and when he returned to his home she visited him every day and literally served as his housekeeper and nurse during that time. At one point, as a gesture of his gratitude, he gave her a present, a check for twenty CT Page 171 thousand ($20,000) dollars. The defendant and his father had apparently, what is called, a love-hate relationship. When his father ultimately died of that disease, they each received sixty thousand ($60,000) dollars from his estate. The parties expended a great deal of money on their lifestyle which might be considered excessive by many reasonable standards.[2]
Prior to the defendant's father's death in 1991, the plaintiff purchased a condominium in New Milford for one hundred eighteen thousand ($118,000) dollars. In order to do this, she made a deposit of forty thousand ($40,000) dollars and financed the balance through a first mortgage. The defendant contributed absolutely nothing to this purchase, although he was a signatory on the promissory note secured by the mortgage. Thereafter, she furnished the condominium with the rest of her money as she described it, emphasizing that she took nothing from her former home on Clapboard Ridge in Danbury. Everything in the condominium was new. The defendant was opposed to living in a condominium but soon changed his mind and took up residence there with her. There did not appear to be any serious problems between the parties until such time as they were married, when according to her testimony, the defendant became abusive toward her, and manifested a very, very serious drinking problem. That problem was so severe that he would not work on Monday and Tuesday of each week using vacation time and apparently not being caught as it were. She, of course joined him in his drinking exploits but not to the same extent.
The description of the condominium at the present time suggests very strongly that it shows substantial wear and tear and is in a highly damaged condition. There are holes in the walls and doors, a broken glass table top, light switches broken, and damage to the carpet from cigarette burns. The dishwasher is inoperable, but whether the result of wear and tear or abuse is not clear. The stove does not function and flames are described as having been shooting out of it for quite some time. The refrigerator exists with towels at the bottom of the cooling compartment, linoleum where installed is scared by cigarettes, and cabinet doors are missing.
As previously mentioned, she works twenty-four (24) to twenty-seven (27) hours per week and denies any health problems prior to November of 1999 when the heart condition previously mentioned was first diagnosed. She is paid an hourly rate of twelve dollars and seventy-five ($12.75) cents. She has not had medical insurance, a pension plan of any kind or a 401K. She does not miss work because of the condition she has. She has minimal dental insurance through CIGNA which has a ceiling of approximately one thousand two hundred ($1200) dollars per year.
Their assets, which have not been previously listed, include, in CT Page 172 addition to the defendant's benefits, a sailboat, a settlement from a class action litigation in the amount of sixteen thousand ($16,000) dollars, plus interest thereon, and some nine thousand ($9,000) dollars net from a dog bite claim. He drives a 1992 Cadillac which was purchased in California and she drives a 1994 Cadillac Eldorado. The evidence indicates that prior to the marriage she originally drove a Mercedes, which was subsequently replaced by a Cadillac Allante, and that in turn was replaced by the vehicle she now drives.
The evidence adduced at trial portrays the defendant as an alcoholic given to fits of rage and acts of violence directed more toward property located in the condominium than to the plaintiff. The defendant for his part offered minimal evidence to contradict this aspect of the plaintiff's testimony. Whether this is a concession of fault or a utilitarian effort to terminate the marriage is open to question. The court finds that the weightier and more credible evidence was offered by the plaintiff and therefore finds the primary responsibility or fault for the breakdown of the marriage to be that of the defendant. However, our Supreme Court has warned against overemphasizing the issue of fault and has placed it in the proper prospective by defining that concept as being one of the many criteria which must be applied in entering orders in a decree of dissolution. See Sands v. Sands, 188 Conn. 98, 102. In her claims for relief, the plaintiff has demanded a dissolution, alimony, equitable division of real and personal property, and counsel fees. These claims will be addressed seriatim.
In determining whether or not to award alimony, courts are directed to consider the length of the marriage, the cause of the dissolution of the marriage or legal separation, the age, the health, the station, the occupation, the amount and source of income, vocational skills, employability, the estate needs of each of the parties, and any property award pursuant to § 46b-81(c). Section 46b-82 of the General Statutes; Dubicki v. Dubicki, 186 Conn. 709, 714-15; citing thereinMcPhee v. McPhee, 186 Conn. 167, 171 n. 3; see Krieble v. Krieble,168 Conn. 7-8; Baker v. Baker, 167 Conn. 476, 478. The purpose of periodic alimony and or lump sum alimony is based primarily upon a continuing duty to support. Dubicki v. Dubicki, supra, 714 n. 2; Wood v. Wood,165 Conn. 777, 778. The court has considered the statutory criteria together with the cases which addressed them as well as the earning capacities of the parties. The defendant's far exceeds the plaintiff's. He is, accordingly, ordered to pay to the plaintiff periodic alimony in the sum of three hundred seventy-five ($375) dollars per week for a period of seven (7) years from the date hereof or until such time as she may remarry, die or cohabitate with an unrelated male. The concept of cohabitation used herein does not engraft the statutory criteria therefor, but rather embraces and applies the common law definition and CT Page 173 standards.
In assigning marital property, the trial court must also consider the liabilities of the parties, the opportunity of each for future acquisition of capital assets and income and the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates. Dubicki v. Dubicki, supra, 714-15; McPhee v.McPhee, supra, 171; Corbin v. Corbin, 179 Conn. 622-624. The court is vested with broad discretion in awarding alimony and dividing property as long as it considers all the relevant statutory criteria. It is not obligated to make express findings on each and it is not required to give equal weight to each in determining the award. No single criterion is preferred over the others and the weight placed on each is dependent upon the circumstances of each case. Debowsky v. Debowsky, 12 Conn. App. 525,326-27; Carpenter v. Carpenter, 188 Conn. 736, 740-41; Weiman v. Weiman,188 Conn. 232, 234. The purpose of the property division is to equitably divide the ownership of the parties property. See Dubicki v. Dubicki, supra, 714 n. 2, It may also be said to unscramble the ownership of property by giving to each spouse what was equitably his/hers. Beede v.Beede, 186 Conn. 191, 195; Weiman v. Weiman, supra; see § 46b-81
n. 2. All the statutory criteria set forth in the cited statute have not been enumerated here as many are repetitious of § 46b-82. Once again, no single criterion is preferred over the others and the weight place.d upon each is based upon the circumstances of the case. Debowskyv. Debowsky, supra, 526-27; Carpenter v. Carpenter, supra, 740-41; Weimanv. Weiman, supra, 234; see § 46b-81 (c) of the General Statutes. This court has considered each and every one of the statutory criteria and the cases which speak to them.
With the foregoing principles in mind, the court awards the plaintiff her condominium in Willow Springs to be her sole property, and she is further ordered to indemnify and hold the defendant harmless from any and all claims arising out of the existent mortgage, as well as the ownership, maintenance and occupation of that condominium. The settlement from the class action litigation in the amount of sixteen thousand ($16,000) dollars, plus interest, is also awarded to the plaintiff to be her exclusive property, and the defendant is awarded no part or interest therein. In addition thereto, the net proceeds from the dog bite incident in the amount of nine thousand ($9000) dollars are exclusively awarded to the plaintiff to be her sole property free and clear from any interest of the defendant therein. To the extent permitted by law or contract, the defendant is ordered to retain the plaintiff as his surviving spouse on all of his Perkin-Elmer plans. The plaintiff is awarded 20 percent of the defendant's 401K employees savings plan, together with 20 percent of the defendant's stock options with PE Corporation. He is ordered to pay over that 20 percent of the 401K savings account to the plaintiff within CT Page 174 twelve (12) months of the date hereof and he is further ordered to pay all fees, penalties, expenses, and costs chargeable to that distribution. To the extent possible by contract, the plan itself or by statute, the defendant is ordered to secure the above award by a Qualified Domestic Relations Order within sixty (60) days from the date of this decree. That order is to be drawn by and the responsibility for and all other documents with respect to the QDRO is to be accomplished by plaintiff's counsel.
The defendant is further ordered to maintain his present life insurance policy obtained through his employment, naming the plaintiff as the irrevocable beneficiary for so long as she is entitled to receive alimony under this decree. He is further ordered to maintain his medical and dental insurance for the benefit of the plaintiff at her costs and expense. The personal property of the parties has been divided between them to their satisfaction, and the court awards each the motor vehicle which he and she are currently operating and each is ordered to hold the other harmless from any and all claims arising out of the ownership, maintenance, operation, or occupancy of those vehicles. Finally, the sailboat which is in storage at a location called Boat Max is declared to be the sole property of the defendant and he is ordered to assume and hold the plaintiff harmless from any and all claims arising out of the ownership, maintenance, operation, storage or use of that boat.
This litigation has been lengthy and highly contested from its inception. Each has claimed counsel fees from the other. The court is not unmindful of the "Koizim Rule" which recites that those parties who possess "ample liquid funds" resulting from prior court orders should pay their own counsel fees. Koizim v. Koizim, 181 Conn. 492, 501. The plaintiff may hardly be said to have had ample liquid funds at this time from any source to satisfy the entire burden of the fees incurred by this litigation. The measure of "ample liquid funds" may be found in Venutiv. Venuti, 185 Conn. 156, 163. The plaintiff in her claim for relief asserts that she is indebted to counsel in the amount of twenty-one thousand nine hundred seventy-five dollars and sixteen ($21,975.16) cents. The defendant is ordered to contribute the sum of ten thousand ($10,000) dollars to the plaintiff as an allowance to prosecute this litigation within twelve (12) months from the date of this decree.
Judgment may enter accordingly.
Moraghan, J.T.R.